**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JURY TRIAL DEMANDED**

**K&R INDUSTRIES, INC.**,
    a Michigan corporation,

        Plaintiff,

    v.

**ONTEL PRODUCTS**
    **CORPORATION,** a New Jersey
    corporation, **ASHOK KHUBANI**,
    an individual who resides in New
    Jersey, and **DOEs 1-99,**
    **INCLUSIVE**, corporate,
    partnership, LLC, and/or other
    business entities from various
    jurisdictions, whose identities are
    to be determined,

        Defendants.

C.A. No. 2:04-CV-72297-JF-DAS

Hon. John Feikens
United States District Judge

Hon. Donald A. Scheer
United States Magistrate Judge

**FIRST AMENDED COMPLAINT FOR TRADEMARK INFRINGEMENT,**
**TRADE DRESS INFRINGEMENT, FALSE DESIGNATION OF ORIGIN,**
**COUNTERFEITING, AND UNFAIR COMPETITION**

1.    This is a trademark infringement and trade dress infringement lawsuit.

2.    Although the product at issue in this case is novel and unique (the

GlassMaster® is an articulated cleaning device for use on automobile windows and other

polished and non-polished surfaces), the fact-pattern in this lawsuit is hardly unique or

unusual. See, e.g., X-It Products Corp. v. Walter Kidde Portable Equip., 227 F. Supp.2d 494,

546, 549 (E.D.Va. 2002); Carlye Adler, *SPECIAL FEATURE: Can you spot the knockoff?*
*If you're a designer, big retailers want your ideas.  They just don't want to pay for them.*,
FORTUNE SMALL BUSINESS (Mar. 12, 2002), Tab A.

## SUBJECT-MATTER JURISDICTION

3.      This honorable Court has subject-matter jurisdiction under 28 U.S.C. § 1331
(federal question), and 28 U.S.C. § 1338(a), (b),[1] because several causes of action asserted
by the Plaintiff arise under the Constitution or Laws of the United States, namely: (1) False
Designation of Origin, in violation of Lanham Trademark Act, 15 U.S.C. § 1125(a); (2)
Trademark Infringement in Violation of the Lanham Trademark Act, 15 U.S.C. §§
1114(1)(a), 1125(a); (3) Counterfeiting, in violation of the Lanham Trademark Act, 15 U.S.C
§ 1114(1)(b); (4) Trade Dress Infringement in violation of 15 U.S.C. § 1125(a), and (5)
Unfair Competition under section 1125(a).

4.      This honorable Court has supplemental jurisdiction over all state-law causes
of action under 28 U.S.C. § 1367(a) and/or 28 U.S.C. § 1338(b).

5.      Insofar as claims against Defendants Ontel Products Corporation and Ashok

---

[1](a)   The district courts shall have original jurisdiction of any civil action arising
under any Act of Congress relating to patents, plant variety protection, copyrights and
trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant
variety protection and copyright cases.

(b)      The district courts shall have original jurisdiction of any civil action
asserting a claim of unfair competition when joined with a substantial and related claim
under the copyright, patent, plant variety protection or trademark laws. . . .

28 U.S.C. § 1338.

1  Khubani are concerned, this honorable Court also has subject-matter jurisdiction under 28

2  U.S.C. § 1332(a)(1), (c)(1) (diversity of jurisdiction), because the Plaintiff (in Michigan) and

3  Defendants Ontel Products Corporation (New Jersey) and Ashok Khubani (New Jersey)

4  reside in different States (complete diversity exists) and the matter in controversy exceeds

5  the value of $75,000.00, exclusive of interest and costs.  However, one or more of DOEs 1-

6  99, INCLUSIVE, are potentially believed to be incorporated and/or to have their principal

7  places of business in Michigan.

8  **PERSONAL JURISDICTION**

9  6.    On information and belief, this honorable Court has general personal

10  jurisdiction, for purposes of the Due Process Clauses of the Fifth and Fourteenth

11  Amendments, over Defendant Ontel Products Corporation, because Ontel has purposefully

12  availed itself in a continuous and systematic manner of the State of Michigan, the benefits

13  of doing business in Michigan, and the benefits and protections of Michigan law, by

14  transacting business in a continuous and systematic manner (including a substantial volume

15  of business with Troy, Michigan-based K-Mart Corporation, and Grand Rapids-based Meijer

16  Corporation, among other Michigan businesses), for many years.  See, e.g., Burger King

17  Corp. v. Rudzeweicz, 471 U.S. 462 (1985).

18  7.    Specific personal jurisdiction also exists over Ontel Products Corporation.

19  8.    General and specific personal jurisdiction exists over Defendant Khubani.

20  9.    General and specific jurisdiction over DOEs 1-99 will be determined in the

21  normal course of discovery, once the identity of these defendants is determined.

10.    This honorable Court also has jurisdiction under the Michigan Long-Arm statute, MCL §§ 600.701 - 600.715, over the person of Ontel Products Corporation and over Khubani. E.g., Neogen Corp. v. Neo Gen Screening, 109 F. Supp. 2d 724, 727-28 (W.D. Mich. 2000), *rev'd on other grounds*, 282 F.3d 883 (6th Cir. Mar. 6, 2002); Ford Motor Co. v. Great Domains, Inc., 141 F. Supp. 2d 763, 771 (E.D. Mi. 2001) (citing Neogen).

11.    Long-arm jurisdiction over DOEs 1-99 will be determined in the normal course of fact discovery.

12.    Defendant Ontel Products Corporation, has already submitted to Michigan personal jurisdiction, in Smith v. Ontel Prods. Co., Civil Action No. 04-CV-70417-JCO-SDP (E.D Mi. *filed* Feb. 4, 2004), by filing an Answer, without raising any defense of lack of personal jurisdiction.

**PARTIES**

13.    Plaintiff K&R Industries, Inc., is a Michigan corporation, headquartered in Wayne County, Michigan.

14.    Defendant Ontel Products Corporation, on information and belief, is a New Jersey corporation, headquartered in Fairfield, New Jersey.

15.    Defendant Khubani is an individual who resides in the State of New Jersey, who is personally and directly involved in all aspects of the business of Defendant Ontel, and, on information and belief, even resides at the same address as Ontel's headquarters. On information and belief, Ontel is an *alter ego* of Khubani.

16.    Defendants DOEs 1-99, INCLUSIVE, are merchants and retailers throughout

the United States (excluding those who, on account of obtaining proper trademark licensing or authorization from Plaintiff, or who Plaintiff has for other reasons voluntarily elected not to sue), who are also subject to suit for the strict-liability torts of trademark and trade dress infringement, as well as for unfair competition and other causes of action – because they have, without Plaintiff's authorization, offered and sold in commerce products (products made and distributed by Defendant Ontel) that infringe Plaintiff's registered trademark GlassMaster®, and which products also infringe the trade dress of Plaintiff's GlassMaster® product and packaging.  The products offered and sold in commerce, without Plaintiff's authorization, by DOEs 1-99, INCLUSIVE, are likely to cause mistake, or to cause confusion, or to deceive as to the affiliation, connection, or association of each such DOE 1-99, INCLUSIVE with Plaintiff, or as to the origin, sponsorship, or approval by Plaintiff of the goods, services, or commercial activities of DOEs 1-99, Inclusive.  Some of DOEs 1-99, INCLUSIVE, may also be corporate affiliates of Defendant Ontel Products Corporation, that are actively involved in the distribution of infringing merchandise, and the active infringement of Plaintiff's GlassMaster® trademark, and Plaintiff's trade dress.

# [INTENTIONALLY LEFT BLANK]

1

## PLAINTIFF'S INTELLECTUAL PROPERTY

2       17.     Plaintiff manufactures and sells in commerce a patented device[2] that assists in

3   the cleaning of glass and other surfaces.  The product looks like this:

4

5

6   

7

8

9

10

11   Plaintiff's cleaning product has been sold for several years under the trademark

12   GlassMaster®.  Plaintiff's GlassMaster® product has been advertised on television in many

13   major media markets.  The trademark for the product has become widely-recognized by

14   customers, nationwide, and has become exclusively and firmly associated with a single

15   source of high-quality products.

16       18.     Plaintiff is the exclusive owner of the federally-registered trademark

17   GLASSMASTER®, Reg. No. 2,466,153, for goods of the following description: "Window

18   cleaning kits, comprised of a handle, paddles interchangeably connected to the handle and

19   an elastic trimmed cloth cleaning towel."  Plaintiff's trademark registration, in force since

20

21       [2]Plaintiff reserves the right to amend this Complaint (or to file a second Complaint
   in a court of competent jurisdiction), to allege the infringement of one or more patents.

1   July 3, 2001, presumptively establishes Plaintiff's exclusive, nationwide, ownership of the

2   mark.[3]

3       19.    At all times since November 28, 2000, Plaintiff has actively and consistently

4   used the GlassMaster® trademark, in interstate commerce, on and in connection with its

5   cleaning product.  The GlassMaster® mark has consistently been used on and affixed to all

6   product packaging of the Plaintiff's cleaning device.

7       20.    Separate and apart from the patented and functional aspects of the

8   GlassMaster® (of course, specific aspects of the product that are functional and that are

9   covered by one or more utility patents, cannot support a trade dress claim),[4] the

10  GlassMaster® product and its packaging have several distinctive design characteristics that

11  serve as trade dress,[5] and that serve a source-identifying function similar to a trademark (the

12  distinctive shape of a Coca-Cola bottle is the classic illustration of trade dress):

13      a.    The distinctive, recognizable, and decorative shape of the GLASSMASTER®

14

15      [3]"Any registration . . . of a mark registered on the principal register provided by
    this chapter and owned by a party to an action shall be admissible in evidence and shall
16  be prima facie evidence of the validity of the registered mark and of the registration of the
    mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to
17  use the registered mark in commerce on or in connection with the goods or services
    specified in the registration subject to any conditions or limitations stated therein . . . ."

18      15 U.S.C. § 1115(a); see also 15 U.S.C. § 1057(b), (c).

19      [4]Traffix Devices, Inc. v. Marketing Devices, Inc., 532 U.S. 23, 30-32 (2003).

20      [5]Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763 (1992) (explaining basis for
    protecting trade dress under Lanham Trademark Act); see also id., at 775 (pointing out
21  special significance of protecting trade dress of small, start-up companies, against
    appropriation of trade dress by larger competitors who may otherwise be inclined to flood
    the market with knock-offs).

1          paddle (paddles can be made in many different shapes, with no decrease in

2          basic functionality):

3     b.      The distinctive and decorative bend in the handle, between the hand-grip, and



15          the paddle-attachment assembly (the device would be just as functional with

16          a straight handle, but would not be as aesthetically distinctive);

17     c.      The distinctive curvature of the profile of the paddle (the paddle is more

18          distinctive because it is not flat);

19     d.      The font and color in which the GlassMaster® trademark is displayed on the

20          product packaging;

21     e.      Product packaging that prominently features an "As Seen on TV" logo (the

1    Plaintiff's product has been featured in television advertising in media markets

2    all across the country);

3    f.    Product packaging that features a large picture of a man using the product to

4          clean the front window of his automobile;[6]

5    g.    The color of the product packaging;

6    h.    The general design and layout of the product packaging.

7  Collectively, these elements generate a unique and distinctive product presentation and trade

8  dress, that serves a source-identifying function to customers.

9    21.    Plaintiff's GLASSMASTER® trademark, because of a trademark registration,

10  is presumptively distinctive and strong.

11    22.    Plaintiff's GLASSMASTER® mark, beyond any presumptions, is inherently

12  distinctive and strong as a trademark.

13    23.    Plaintiff's GLASSMASTER® mark, through six years of advertisement and

14  promotion in markets all over the country, has been strengthened and has acquired additional

15  secondary meaning in the minds of customers and potential customers, and serves an

16  unmistakable source-identifying function to customers.

17    24.    Plaintiff's trade dress is also distinctive of this product (and of Plaintiff's

18  identity as the unique source and origin of the product).  This trade dress signifies that a

19

20    [6]See, e.g., X-It Prods. v. Walter Kidde Portable Equip., 155 F. Supp. 2d 577, 617-
21  24 (E.D. Va. 2001) (addressing very similar trade dress claim based on packaging
   design), *subsequent proceeding*, 227 F. Supp. 2d 494 (E.D. Va. 2002), *appeal dismissed
   due to settlement*.

1  product with the same or closely similar trade dress, comes from a single, unique, source

2  (namely, the maker of the Plaintiff's product) – even if customers do not know the name or

3  identity of the source.

4       25.     Plaintiff's trade dress is inherently distinctive.

5       26.     Plaintiff's trade dress – through six years of advertisement and promotion in

6  markets all over the country – has been strengthened and has acquired additional secondary

7  meaning in the minds of customers and potential customers, thereby serving an unmistakable

8  source-identifying function to customers.

9       27.     Plaintiff has invested considerable amounts advertising and promoting the

10  GlassMaster® trademark, and the product's unique trade dress.  In the course of this

11  advertising and promotion, the trademark and trade dress have become strongly associated

12  in the minds of the purchasing public with the Plaintiff's window-cleaning system.

13  **<u>ONTEL PRODUCTS CORPORATION</u>**

14       28.     Ontel Products Corporation has a well-known and somewhat notorious

15  litigation history, arising out of its sales of products (and product packaging) that closely

16  imitate the original products and product ideas of others (generally, the original ideas of start-

17  up companies who are promoting their products on television).  For instance (this is only a

18  sample, not a complete history of all of Ontel's litigation), Ontel has been sued in these

19  cases:

20       •     <u>Hatchett v. Ontel Prods. Corp.</u>, No. 96-CV-3433 (S.D. Fl. *filed* Nov. 27, 1996)

21            (Ontel sued for patent infringement); <u>Hatchett v. Ontel Prods. Corp.</u>, No. 97-

CV-63 (N.D. Miss. *filed* Apr. 22, 1997) (same).

• Computer Business Works v. Ontel Prods. Corp., No. 2:04-CV-03551-MMM-RNB (C.D. Cal. *filed* May 20, 2004) (in litigation involving some of the same parties as two trademark lawsuits in California state court,[7] Ontel is directed to show cause why it should not be enjoined from infringing copyright for inkjet refill instructions);

• Trade Assocs., Inc. v. Ontel Prods. Corp, 2:01-CV-01724-BJR (W.D. Wa. *filed* Oct. 24, 2001) (Ontel sued for infringing "AIR FORCE" trademark on or in connection with household tools);

• Ensar Corp. v. Ontel Prods. Corp., No. 2:96-CV-04285-JAG (D. N.J. *filed* Sept. 11, 1996) (Ontel sued for patent infringement and permanently enjoined from infringing patent);

• E. Mishan & Sons v. Ontel Prods. Corp., C.A. No. 1:00-CV-04161-LLS (S.D.N.Y. *filed* June 5, 2000) (Ontel sued for trademark infringement);

• Ferris Marketing, Inc. v. Ontel Products Corp., C.A. No. 1:02-cv-11114-GAO (D. Mass. *filed* June 3, 2002) (Ontel sued for copyright infringement);

• DDS Marketing, Inc. v. Ontel Prods. Corp., 2:97-cv-00096-KSH (D. N.J. *filed* Jan. 13, 1997) (Ontel sued for trademark infringement);

---

[7]Plaintiff's counsel in this case briefly represented Computer Business Works, in connection with covering one deposition in Grand Rapids, Michigan, as part of one of the California state-court lawsuits. Counsel did not represent Ontel Products Corporation, or learn any confidential information of Ontel.

- Ingenious Designs v. Khubani, *et al.* C.A. No. 0:97-CV-00147-DRH (E.D.N.Y. *filed* Jan. 11, 1997) (Ontel sued for trademark infringement);

- Welcome Co., Ltd. v. Telebrands Corp., *et al.*, C.A. No. 2:97-CV-09379-DT-JG (C.D. Cal. *filed* Dec. 17, 1997) (Ontel sued for infringing patents); Welcome Co., Ltd. v. Ontel Prods. Corp., C.A. No. 00-CV-8665 (C.D. Cal. *filed* Aug. 15, 2000) (patent infringement);

- Project Strategies Corp. v. Ontel Prods. Corp., C.A. No. 2:94-cv-05984-WGB (D.N.J. *filed* Dec. 16, 1994) (trademark infringement); Ontel Prods. v. Project Strategies, C.A. No. 1:94-CV-09025-HB (S.D.N.Y. *filed* Dec. 16, 1994).

29.     On information and belief, Ontel has represented to third-parties, and tried to create the belief in others that it "owns," or has some kind of exclusive right to, the slogan "as seen on television."  Ontel, to the contrary, is neither the only company to use this designation, nor does it have any legally-enforceable right to exclude others from using it.

30.     Moreover, Ontel in the past marked some of its products with slogans and logos such as "similar to products seen on television," to create the misleading impression that Ontel's products (imitations of the products of small start-ups -- who advertised on television) are or were the same ones that people saw in television advertising – when, in fact, Ontel's products are and were not the same ones seen by customers on TV.

31.     More recently, because of legal problems with the strategy summarized in Paragraphs 29 and 30, Ontel has taken to producing its own "infomercials" for knock-off products (so that both the knock-off and the original product are both seen on television, but

1   at different times, in different commercials, produced by different companies), and then using

2   the "as seen on TV" logo to create the false impression that Ontel is the source or origin of

3   someone else's product that Ontel has knocked-off.

4       32.    From the various infringement lawsuits against Ontel, an evident pattern of

5   conduct emerges.  Ontel has an advantage over smaller start-up companies (which companies

6   generally have one product and must establish retail relationships from scratch) because

7   Ontel has for many years developed an extensive network of retail outlets, to which it ships

8   its wares.  Because of this advantage from an installed base of retailers, Ontel is able to put

9   essentially any small first-mover out of business, by saturating the market with a cheaper

10   knock-off with reduced functionality – before moving on to the next product and the next

11   victim.

12       33.    Ontel learns of smaller competitors' good product ideas from television, and

13   then obtains a sample of any product(s) it wants to knock-off.  Ontel then makes minor,

14   cosmetic, changes to the product and to the product packaging – so that Ontel's version is

15   not identical (just confusingly similar) to the original product.

16       34.    Ontel then sends its re-designs overseas (generally, to mainland China), where

17   each such knock-off can be manufactured in huge quantities at very low cost.  Thus, at just

18   the time when the hard work of an entreprenurial American company – priming the market

19   to recognize and accept a new and useful product – is just about to pay off, Ontel jumps into

20   the market with inferior, imitation knock-off devices, and floods the market with them,

21   thereby profiting handsomely from the work and original ideas of others.

35.     The reason that Ontel sometimes gets away with it is essentially a numbers game – not all instances of infringement are detected, and for many instances that are, by the time the victim sees what is coming, it is often too late.

36.     Moreover, even when the victim of infringement has the opportunity to do something about it, a significant percentage elect not to sue.    As explained succinctly in Carlye Adler, *SPECIAL FEATURE: Can you spot the knockoff?  If you're a designer, big retailers want your ideas.  They just don't want to pay for them.*, FORTUNE SMALL BUSINESS (Mar. 12, 2002), Tab A:

> Taking on a big company can be expensive, though. In intellectual-property lawsuits in which less than $1 million is at stake, attorneys' fees and costs average $400,000, according to Penta Advisory Services in Washington, D.C., a consulting company. When $1 million to $10 million is at stake, the fees average $1 million. Most small businesses can't afford that, especially when the outcome is so uncertain. Aldo DiBelardino, co-founder and director of X-IT, had to remortgage his house and dip into his retirement savings to cover his legal costs for the lawsuit against Kidde. And even though his company won in court, he says some bills still remain unpaid, as X-IT hasn't yet received the check for damages.

Thus, even if Ontel is required to disgorge all the profits from 1/3 of the products and devices it knocks-off, Ontel still winds up making a handsome profit on all the infringement that it gets away with -- unchallenged.

37. Moreover, even in those cases in which victims of Ontel's knock-off scheme elect to go to court, Ontel tends to use its financial resources and distribution advantages to buy them off.

38. Even when companies use Ontel as a distribution channel, however, on information and belief, Ontel nevertheless takes advantage of their product ideas, their trust, and confidence. For instance, in the Computer Business Works ("CBW") case in California, Ontel and CBW entered into an arrangement to distribute CBW's inkjet refill kits through Ontel Channels. On information and belief, CBW later learned that counterfeit CBW "Universal" inkjet refill kits had entered the market – which duplicated the trademarks and trade dress of the genuine articles in every way. On information and belief, CBW discovered that Ontel (its supposed business partner) was the entity that was distributing the fake inkjet refill kits, along with the genuine articles that Ontel obtained from CBW. Ontel and CBW are now involved in litigation and arbitration to resolve this apparent scheme by Ontel to profit off of CBW's trademarks, trade dress, and product ideas, by only paying CBW for a fraction of the units actually shipped by Ontel, and then filling the rest of Ontel's shipments with cheaper knock-offs specially manufactured for Ontel, overseas.

39. In other cases, Ontel will pay off those who sue it by offering an amount of money to make the infringement lawsuit go away, but not enough to fully compensate the settling party for all the lost business and harm the infringement has caused. Even after paying off the percentage of victims who sue, Ontel is left with enormous profits and a big enough war-chest to threaten anyone who does not take their deal, that the alternative will

1    be unpleasant and costly.

2        40.    The end result of Ontel's business practices is significant harm to small

3    manufacturers – and their workers – in the United States and Canada, as well as significant

4    financial harm to creative persons, inventors, and designers in the United States.

5        41.    The beneficiaries appear to be the owners of Ontel, and the owners of the

6    Chinese factories in which Ontel's knock-offs are made by low-wage workers who have no

7    rights to organize, no health benefits, and little of the protections that would result were

8    China to adopt adequate regulations to govern workplace safety, hours, and other conditions.

9                   **ONTEL'S INFRINGEMENT**

10        42.    In this instance, Ontel has started flooding the market with a product called the

11    Glass Wizard, which it has started advertising on television and is shipping to many retailers

12    in various locations:



13

14

15

16

17

18

19

20

21

43.   The Ontel Glass Wizard directly copies and infringes each and all of the specific non-patented aspects of the GlassMaster® trade dress alleged in Paragraph 20, *supra*.  The Glass Wizard is not protected by any patent or by any trademark registration with the U.S. Patent & Trademark Office.

44.   It is probably understandable why Ontel has not sought to register "Glass Wizard" as a trademark for this product – because Ontel is already on statutory notice that Plaintiff has exclusive, nationwide, right to the trademark GlassMaster®, which means that anybody who uses a mark so similar as to be *likely* to deceive, or to cause mistake, or to cause confusion, cannot obtain a registration (such as for the mark "Glass Wizard").

45.   "Glass Wizard" is, in fact, confusingly similar to Plaintiff's GlassMaster® trademark, under the eight-factor test established for "likelihood of confusion," in trademark cases, in the Sixth Circuit.  See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, 670 F.2d 642, 648 (6th Cir.), *cert. denied*, 459 US 916 (1982).

46.   Strength of Senior Mark: GlassMaster® is a strong mark, both because of inherent distinctiveness, and due to additional acquired distinctiveness and secondary meaning resulting from several years of promotion, and widespread advertisement in nationwide commerce.

47.   Relatedness of the Goods or Services: The GlassMaster® and the Glass Wizard are directly competitive products, that do the same thing, that Ontel has intentionally caused to look alike, and that are sold to the same customers.

48.   Similarity of the Marks: Under the traditional "sight, sound, and meaning"

test,[8] the marks are indistinguishable and are highly likely to cause confusion when singly presented.  Both are pronounced with the same rhythm, have the same number of syllables, and the same number of letters.  Both marks look alike, and both begin with the word "Glass."  The remainder of each mark is a term – "Master" or "Wizard" – that conveys masculine dominance over a task, masculine power, and superior skill at accomplishing a task.  In short, the marks are identical for all practical purposes.

49.   Evidence of Actual Confusion: Since the introduction of the knock-off Glass Wizard product, significant numbers of confused persons (both retailers who purchase large numbers of units, and end-users) have come to light.

50.   Marketing Channels Used: These products are marketed and sold through essentially the same channels – both direct sales through television advertising, and retail sales to end-users in stores carrying both general and specialty merchandise.

51.   Likely Degree of Purchaser Care and Sophistication: These are not complicated technical devices, or customized goods -- and, therefore, purchasers are unlikely to exercise much care to make sure that the cleaning wand they purchase is the same GlassMaster® product that they actually wanted to purchase after they saw GlassMaster® on television.

---

[8]Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1188 (6th Cir. 1988) (citing James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 275 (7th Cir. 1976)).

1       52.   <u>Intent of the Defendant in Selecting the Mark</u>: Active copying of the mark –

2   which is evident in this instance (OnTel could have used a much different trade

3   dress and a non-confusing trademark such as "Auto Shine," but OnTel didn't)

4   – creates a presumption that the infringer intended to cause the public to

5   confuse the competing products;

6       53.   <u>Likelihood of Expansion of the Product Lines</u>: Since the products already

7   directly overlap, they cannot possibly come any closer in the future, through

8   expansion of product lines.

9       54.   Moreover, the Glass Wizard is an inferior product because the pivot

10  mechanism of the Glass Wizard does not allow paddles to be interchanged with the same

11  ease as paddles can be interchanged on a genuine GlassMaster® cleaning wand.

12      55.   Interchanging paddles for an Ontel Glass Wizard (say, if one saturates the first

13  paddle with a solvent and then needs a "dry" paddle) is much more difficult and potentially

14  hazardous to customers with the Glass Wizard, than with the GlassMaster®'s patented

15  paddle-change, and pivot device.

16      56.   The Glass Wizard is not consistent with the quality standards that the public

17  has come to associate and expect from genuine GlassMaster® products.

18      57.   The same eight-factor test applies to trade dress infringement, as to trademark

19  infringement, and under the same test, Ontel is equally guilty of trade dress infringement, as

20  a matter of law.

21      58.   Under the analysis set forth in <u>PACCAR, Inc. v. Telescan Techs.</u>, 319 F.3d 243

1   (6th Cir. 2003) ("First, if the parties compete directly by offering their goods or services,

2   confusion is likely if the marks are sufficiently similar; second, if the goods or services are

3   somewhat related but not competitive, the likelihood of confusion will turn on other factors;

4   third, if the goods or services are totally unrelated, confusion is unlikely."), a *likelihood* of

5   confusion, and trademark infringement, are established as a matter of law.

6   ## COUNT ONE – FALSE DESIGNATION OF ORIGIN

7   59.    Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-58 as

8   though set forth verbatim herein.

9   60.    Plaintiff is the exclusive worldwide owner of the federally-registered

10  GlassMaster® trademark and brand name.

11  61.    The mark is distinctive and/or has acquired secondary meaning as an

12  identification that products (pivot-head surface-cleaning wands, in particular) come from the

13  Plaintiff.

14  62.    Quite recently, Defendants (including Defendant Ontel), have been using a

15  confusingly similar trademark on a directly-competing but inferior product, and causing

16  actual confusion in the marketplace, even though none of the Defendants-Infringers is the

17  source of genuine GlassMaster® cleaning wands, and none of them has ever been properly

18  authorized or licensed by the Plaintiff to do so.

19  63.    In so doing, in connection with the sale of goods or services in commerce,

20  Defendants-Infringers (or one or more or all of them), has falsely used in commerce (and

21  published falsely to customers) one or more words, terms, symbols, names or devices, and/or

one or more combination(s) thereof, and/or one or more false designation(s) of origin, and/or a false or misleading description of fact, and/or misleading representation of fact.

64.    Defendants'-Infringers' use in commerce (and publication falsely to customers) of words, terms, symbols, names or devices, and/or one or more combination(s) thereof, and/or one or more false designation(s) of origin, and/or one or more false or misleading description(s) of fact, and/or misleading representation(s) of fact are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, or connection, or association of Defendants-Infringers (or one or more or all of them) as to the origin, sponsorship, or approval of the Plaintiff.

65.    Defendants-Infringers (or one or more or all of them – **especially Ontel**) have willfully engaged in the falsification of designations of origin and/or representations or descriptions of fact concerning such goods and/or services.

66.    Plaintiff, and the goodwill associated with Plaintiff's mark, has been materially injured by the foregoing misconduct of the Defendants-Infringers.

**COUNT TWO – TRADEMARK INFRINGEMENT
IN VIOLATION OF 15 U.S.C. § 1114**

67.    Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-66 as though set forth verbatim herein.

68    Plaintiff is the exclusive worldwide owner of the federally-registered GlassMaster® trademark and brand name.

69.    The mark is (presumtively and actually) distinctive and/or has acquired secondary meaning as an identification that products (pivot-head surface-cleaning wands, in

1  particular) come from the Plaintiff.

2      70.    Quite recently, Defendants (including Defendant Ontel), have unlawfully been

3  using in commerce a reproduction, counterfeit, copy, or colorable imitation of Plaintiff's

4  registered mark -- on or in connection with the sale, offering for sale, distribution, or

5  advertising of Defendants goods or services.

6      71.    Defendants' use of said reproduction, counterfeit, copy, or colorable imitation

7  of Plaintiff's registered mark -- on or in connection with Defendants' goods -- is (due to the

8  nature of such gioods) highly likely to cause confusion, or to cause mistake, or to deceive,

9  and therefore violates 15 U.S.C. section 1114(1)(a), of the Lanham Trademark Act.

10     72.    Defendants' violation of Plaintiff's registered trademark, specifically, involves

11  a directly-competing but inferior product.

12     73.    Defendants' infringement of the registered trademark is causing actual

13  confusion in the marketplace.

14     74.    None of the Defendants-Infringers is the source of genuine GlassMaster®

15  cleaning wands, and none of them has ever been properly authorized or licensed by the

16  Plaintiff to do so.

17     75.    Defendants-Infringers (or one or more or all of them – **especially Ontel**) have

18  willfully engaged in the falsification of designations of origin and/or representations or

19  descriptions of fact concerning such goods and/or services.

20     76.    Plaintiff, and the goodwill associated with Plaintiff's mark, has been materially

21  injured by the foregoing misconduct of the Defendants-Infringers.

**COUNT THREE -- TRADEMARK INFRINGEMENT**
**IN VIOLATION OF 15 U.S.C. § 1125(a)**

77.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-76 as though set forth verbatim herein.

78.     Plaintiff is the exclusive worldwide owner of the federally-registered GlassMaster® trademark and brand name.

79.     The mark is distinctive and/or has acquired secondary meaning as an identification that products (pivot-head surface-cleaning wands, in particular) come from the Plaintiff.

80.     Quite recently, Defendants (including Defendant Ontel), have been using a confusingly similar trademark on a directly-competing but inferior product, and causing actual confusion in the marketplace, even though none of the Defendants-Infringers is the source of genuine GlassMaster® cleaning wands, and none of them has ever been properly authorized or licensed by the Plaintiff to do so.

81.     In so doing, in connection with the sale of goods or services in commerce, Defendants-Infringers (or one or more or all of them), has falsely used in commerce (and published falsely to customers) one or more words, terms, symbols, names or devices, and/or one or more combination(s) thereof, and/or one or more false designation(s) of origin, and/or a false or misleading description of fact, and/or misleading representation of fact.

82.     Defendants'-Infringers' use in commerce (and publication falsely to customers) of words, terms, symbols, names or devices, and/or one or more combination(s) thereof, and/or one or more false designation(s) of origin, and/or one or more false or misleading

description(s) of fact, and/or misleading representation(s) of fact are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, or connection, or association of Defendants-Infringers (or one or more or all of them) as to the origin, sponsorship, or approval of the Plaintiff.

83.     The actions of Defendants-Infringers (or one or more or all of them), as set forth above, infringe the trademark of the Plaintiff, and cause deception or mistake or confusion of customers in the marketplace, in violation of 15 U.S.C. § 1125(a).

84.     The actions of Defendants-Infringers (or one or more or all of them), as set forth above, are intentional and willful, and are calculated to cause deception or mistake or confusion of customers in the marketplace.

85.     Defendants-Infringers have willfully infringed the Plaintiff's trademark.

## COUNT FOUR -- COUNTERFEITING

86.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-85 as though set forth verbatim herein.

87.     Plaintiff is the exclusive worldwide owner of the federally-registered GlassMaster® trademark and brand name.

88.     The mark is distinctive and/or has acquired secondary meaning as an identification that products (pivot-head surface-cleaning wands, in particular) come from the Plaintiff.

89.     Quite recently, Defendants (including Defendant Ontel), have been using a confusingly similar trademark on a directly-competing but inferior product, and causing

actual confusion in the marketplace, even though none of the Defendants-Infringers is the source of genuine GlassMaster® cleaning wands, and none of them has ever been properly authorized or licensed by the Plaintiff to do so.

90.     Defendants, in so doing, have reproduced, counterfeited, copied, or colorably imitated Plaintiff's registered mark and applied such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used (and actually used by Defendants) in commerce -- on, upon, or in connection with the sale, offering for sale, distribution, or advertising of Defendant goods or services.

91     Defendants' unauthorized and unlawful use of said reproduction, counterfeit, copy, or colorable imitationon of Plaintiff's mark on, upon, or in connection with Defendants' goods is likely to cause confusion, or to cause mistake, or to deceive.

92.     The actions of Defendants-Infringers (or one or more or all of them), as set forth above, are intentional and willful, and are calculated to cause deception or mistake or confusion of customers in the marketplace.

93.     Defendants-Infringers have willfully infringed the Plaintiff's trademark.

### **<u>COUNT FIVE – TRADE DRESS INFRINGEMENT</u>**

94.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-93 as though set forth verbatim herein.

95.     Plaintiff is the exclusive worldwide owner of the distinctive and original trade dress of the GlassMaster® pivot-head surface-cleaning wand.

96.     The mark is distinctive and/or has acquired secondary meaning as an identification that the products (pivot-head surface-cleaning wands) come from the Plaintiff.

97.     Quite recently, Defendants (including Defendant Ontel), have been using a confusingly similar trade dress on and in connection with a directly-competing but inferior product, and causing actual confusion in the marketplace, even though none of the Defendants-Infringers is the source of genuine GlassMaster® cleaning wands, and none of them has ever been authorized or properlicensed by Plaintiff to do so.

98.     In so doing, in connection with the sale of goods or services in commerce, Defendants-Infringers (or one or more or all of them), has falsely used in commerce (and published falsely to customers) one or more words, terms, symbols, names or devices, and/or one or more combination(s) thereof (i.e., the knock-off trade dress) and/or one or more false designation(s) of origin, and/or false or misleading descriptions of fact, and/or misleading representations of fact.

99.     Defendants'-Infringers' use in commerce (and publication falsely to customers) of the infringing trade dress is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, or connection, or association of Defendants-Infringers (or one or more or all of them) as to the origin, sponsorship, or approval of the Plaintiff.

100.    Defendants-Infringers (or one or more or all of them – **especially Ontel**) have willfully engaged (through a misleading and deceptive trade dress) in the falsification of designations of origin and/or representations or descriptions of fact concerning such goods and/or services, and are liable for trade dress infringement.

101.   Plaintiff, and the goodwill associated with Plaintiff's mark, has been materially injured by the foregoing misconduct of the Defendants-Infringers.

## COUNT SIX – UNFAIR COMPETITION

102.   Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-101 as though set forth verbatim herein.

103.   The actions of Defendants-Infringers, as set forth above, also constitute unfair competition, which is separately actionable under federal trademark law.

104.   Defendants-Infringers have willfully engaged in unfair competition.

## COUNT SEVEN – UNFAIR COMPETITION (STATE LAW)

105.   Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-104 as though set forth verbatim herein.

106.   The actions of Defendants-Infringers, as set forth above, also constitute unfair competition, which is separately actionable under Michigan state law.

107.   Defendants-Infringers have willfully engaged in unfair competition.

## COUNT EIGHT – TRADEMARK INFRINGEMENT (STATE LAW)

108.   Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-107 as though set forth verbatim herein.

109.   The actions of Defendants-Infringers, as set forth above, infringe the trademark of the Plaintiff, and are calculated to cause deception or mistake or confusion of customers in the marketplace, which is separately actionable under Michigan state law.

110.   Defendants-Infringers have willfully infringed the Plaintiff's trademark.

**<u>CONCLUSION AND PRAYER FOR RELIEF</u>**

Wherefore, based on the foregoing claims and causes of action, Plaintiff prays for the following specific relief:

1.     That this honorable Court issue a preliminary injunction, prohibiting any further infringement of Plaintiff's registered GlassMaster® trademark, or of Plaintiff's distinctive trade dress, by any and all of the Defendants-Infringers, or by anyone in active concert or participation with them, for the duration of the lawsuit.

2.     That this honorable Court issue a permanent injunction, permanently prohibiting infringement of Plaintiff's registered GlassMaster® trademark, or of Plaintiff's distinctive trade dress (or unfair competition, or false designation of origin, using the Plaintiff's trademark or trade dress or coloreable imitation thereof) by the Defendants-Infringers, or by anyone in active concert or participation with them.

3.     That the Defendants-Infringers be permanently enjoined from using in commerce any device, name, word, symbol, or designation of origin (including, without limitation, any Internet domain name) that is confusingly similar to Plaintiff's registered GlassMaster® trademark, or of Plaintiff's distinctive trade dress, on or in connection with any cleaning tools or devices.

4.     That the Defendants-Infringers be permanently be enjoined from taking any action that is likely to infringe, or that is calculated or intended to infringe, or to result in unfair competition with, the Plaintiff and/or Plaintiff's registered GlassMaster® trademark, and/or Plaintiff's distinctive trade dress;

5.      That the Defendants-Infringers be required to make a full accounting of revenues and profits to the Plaintiff.

6.      That the Defendants-Infringers be required to disgorge their profits – 15 U.S.C. § 1117(a)(1).

7.      That the Plaintiff recover the Plaintiff's actual damages from the Defendants-Infringers – § 1117(a)(2), including a reasonable royalty (such as would have been paid had a license been properly obtained);

8.      That Defendants-Infringers be required to pay the costs of the action.

9.      That Defendants-Infringers be required to pay statutory damages as set forth in 15 U.S.C. § 1117.

10.      That the amount of the judgment for profits, damages and disgorgement be trebled, as permitted in 15 U.S.C. § 1117(a), to assure full and complete compensation to the Plaintiff.

11.      That Defendants-Infringers be held to pay the reasonable attorney's fees of the prevailing Plaintiff.

12.      That Plaintiff be granted such other and further relief, whether in law, equity, or otherwise, as to which Plaintiff may be justly entitled.

1

2

## <u>JURY DEMAND</u>

3

Plaintiff demands a trial by jury for all issues so triable.

4

                              Respectfully submitted,

5

                              **K&R INDUSTRIES, INC.,**

6

                              By counsel,

7   July 6, 2004

                             ___/s/ Eric C. Grimm_____

                              Eric C. Grimm (P58990)

8

                              Joseph A. Cruciani (P53922)

                              **CALLIGARO & MEYERING, P.C.**

9

                              20600 Eureka Road

                              Suite 900

10

                              Taylor, MI  48180

                              734.283.2727

11

                              Fax 734.246.8635

12

                              COUNSEL FOR PLAINTIFF.

13

14

15

16

17

18

19

20

21



· Try 3 Issues Free
· Magazine Customer
Service
· Subscribe to
FORTUNE

SEARCH FORTUNE

HOME    COMPANIES    CEOs    INVESTING    CAREERS    TECHNOLOGY    SMA

SPECIAL FEATURE
Can You Spot the Knockoff?
If you're a designer, big retailers want
your ideas. They just don't want to pay for them.
FORTUNE SMALL BUSINESS
Tuesday, June 22, 2004
By Carlye Adler



Keri Beyer had every reason to think pottery Barn Kids would
continue to treat her fairly. Back in 1995, Beyer had launched a
children's furniture company in Stillwater, Minn., called
Wigglestix. In her first few years she sold mostly to mom-and-
pop furniture stores, but fulfilling small orders from a tiny bed-
and-breakfast town on the Wisconsin border wasn't getting her
anywhere. In 1999 she hit her first home run, when Pottery Barn
Kids placed an order for $400,000 worth of furniture, more than
Beyer's first three years of revenue combined.

So when Jennifer Kellor, a rep from Pottery Barn Kids, checked
in a year and a half later to ask about new products at
Wigglestix, Beyer was thrilled and says she anticipated another
big order. Kellor twice flew out to Minnesota from Pottery
Barn's headquarters in San Francisco and took digital photos of
Beyer's latest pieces, including a scalloped bookshelf, a farmer's
bench, and a wooden desk with a hutch. Kellor also wanted to
know Beyer's thoughts on future lines and upcoming trends in
the business. Back on the West Coast, Kellor phoned to ask for
product samples, and Beyer enthusiastically complied. She had
to pay her ten employees overtime to get everything finished, but
says she figured it was worth it, as it allowed her to ship
thousands of dollars' worth of merchandise overnight, including
the bookshelf, the desk, two coat racks, a lemonade stand, and
eight footstools (one in each color available).

For the next few months, Beyer heard nothing. She tried to
check in, but all her e-mails and phone calls to Kellor went
unreturned. When she reached other people at the company, she
says, she was given excuses why they no longer seemed

Case 2:04-cv-72297-JF-DAS    Document 3    Filed 07/06/04    Page 32 of 37

interested. "The price is too high," one person told her. "We still have footstools left over from last season," another explained.

Then the 2001 Pottery Barn Kids catalog came out. In it was a scalloped bookshelf that looked suspiciously like the Wigglestix bookshelf -- smaller but with the same basic design. There was also a desk-and-hutch set strikingly similar to Beyer's, though it was priced almost $100 cheaper. Beyer says she was ashamed and angry, and thought about taking some kind of legal action but ultimately didn't. "It's not like I invented 'The Desk,' " she says. "And they changed the legs, so I couldn't be totally sure." Ironically enough, a different rep from Pottery Barn Kids contacted Beyer months after that, again asking if she might be willing to show the company some of her newer products. Of course Beyer refused.

Tracy Brown, the director of public relations for Williams-Sonoma, which owns Pottery Barn, disputes this version of events. "Wigglestix was unable to keep up with production, and we experienced serious quality issues with their products," Brown wrote in an e-mail. "We lost sales, and were disappointed that we were unable to continue doing business with them." Beyer acknowledges some production glitches but says that still doesn't justify what happened. "The fact is, they took my ideas and my products and ripped me off."

Her experience, although alarming, is not all that unusual, say many independent designers who have shown products to big companies and then seen similar versions suddenly appear in catalogs and stores. John McCarthy, president of a kids' clothing company called Mack & Moore, sold a unique $75 fuchsia coat made of fleece with flowers and stripes on it. He sent the coat to Kmart, along with a few other samples, in hopes of getting a contract, but Kmart said it wasn't signing any new vendors. A year later one of Mack & Moore's sales reps happened to be shopping in Kmart and found a knock-off of the fuchsia coat selling for less than $20. Similarly, Karen Krieger, who sells metal jewelry and frames to galleries, couldn't believe it when her cousin found a "cheapened and uglified" version of her signature "Change of Heart" picture frame, which she sells wholesale for $41, on the shelves at Target for $9.99. Some of the galleries Krieger dealt with dropped the suddenly less exclusive product, and her frame sales plummeted from $90,000 to $30,000.

Calls to Kmart, which is currently in bankruptcy proceedings, were not returned. A spokesman from Target, Douglas Kline, says that he's not aware of the incident with Krieger and her picture frames, but that the company has a huge reservoir of design partners and resources.

Experts say there's no way to quantify the monetary losses from this type of intellectual-property theft, since so much of it goes undetected and unreported. U.S. businesses as a whole lose some $200 billion a year because of counterfeit consumer goods, according to the International Anti-Counterfeiting Coalition. Most of that comes from big companies -- particularly in the fashion business -- having their stuff copied by small-timers (like those Chanel bags you see selling on city street corners for $15). But a growing component comes from knockoffs in the other direction -- when big companies copy goods made by entrepreneurs. The problem is clearly getting worse, says Joel D. Joseph, the chairman and general counsel of the Made in the USA Foundation, which helps represent craftspeople in intellectual-property lawsuits against big retailers. One explanation has to do with simple economics -- it's expensive for retail chains to come up with their own ideas, and much cheaper to simply borrow them from outsiders.

"In-house designers continue to develop the standard product line while the company looks outside for innovative ideas that they will license -- or steal," says Krystina Castella, a designer and consultant who teaches at the Art Center College of Design in Pasadena. After that, the companies can get the products made cheaply overseas and undercut the original entrepreneurs on price.

Unfortunately, the people who see their work replicated elsewhere often say it's tough to stop. "As a small business person, there's only so many things you can do," says Beyer at Wigglestix. "Taking on Pottery Barn Kids seemed like it would use a lot of the resources that I don't have -- time and money. I let go of the fact that there was not much I could or wanted to do to address their ripping me off."

What Pottery Barn, Kmart, and Target are accused of may be unethical, but is it illegal? After all, companies borrow from one another all the time. Different designers might hit on the same idea, and often the products in question aren't identical. "A crate is a crate, honey," Mitchell Salzman told his wife, Susan, when Pottery Barn Kids introduced a storage line similar to the one she'd come up with for their store, Little Folk Art, based in Santa Monica, Calif.

In fact, the precise difference between borrowing and stealing is often hard to pin down. "There is no bright-line rule," says Paul R. Levenson, an attorney who handles intellectual-property cases at Kaplan Gottbetter & Levenson in New York. "It's a case-by-case decision." Most entrepreneurs have long thought that infringement boils down to numbers -- that if a company alters, say, 30% or more of an existing design it can avoid being sued.

Case 2:04-cv-72297-JF-DAS    Document 3    Filed 07/06/04    Page 34 of 37

But Levenson says the percentage rule isn't legally valid. (And besides, the math can get fuzzy; what's 30% of a crate?) When pressed for specifics, Levenson explains that an infringer can't change the color of a design and call it his own. He can't change the size and call it his either. But can he change the proportion? Maybe. The shape? Yes.

Even if design theft isn't always black-and-white, however, some recent incidents seem pretty egregious, less like the sincerest form of flattery and more like flat-out copying. When Judi Boisson, owner of Judi Boisson American Home Collection, a home-furnishings company in Southampton, N.Y., recently sent a cease-and-desist letter to Lillian Vernon Corp. for copying one of her quilts, the company asked if it could continue selling the knockoff for another six months. Ingo Williams' company, Bedford/Downing Glass, had been successfully selling glass picture frames to upscale retailers, including Bloomingdale's and Barneys, for years before his idea started to be knocked off by everyone from Pottery Barn to Z Gallerie. "My frames are made by the Chinese army, Mexican Peyotes, Inuit Eskimos, and Indian children," he says. "But they are no longer my frames." One corporation, Fetco International, bought up a type of textured glass Williams used and shipped it to a Chinese manufacturer, so he had to stop making them for nearly six months.

David Hochberg, vice president of public affairs at Lillian Vernon Corp. in Rye, N.Y., says that the company never knowingly or willfully infringes on copyrighted artwork and immediately stops shipping any items in dispute until the dispute gets resolved. "Ninety-nine percent of the time these issues are settled out of court and amicably, with a royalty agreement for the designer," he adds. Fetco did not return calls by press time.

One of the most extreme examples involved X-IT, a tiny company started by two Harvard Business School students who came up with a collapsible fire-escape ladder for homes. They launched the company on a shoestring and even used a photograph of their own family members on the box because they couldn't afford models. Then Walter Kidde Portable Equipment, the largest U.S. maker of home-safety products, considered buying X-IT. Kidde signed a confidentiality agreement and looked at plans for the ladder, among other things, but then announced it wouldn't buy the company after all. A few months later Kidde introduced a ladder that not only was similar to X-IT's but came in identical packaging, with the same photograph of X-IT family members on the box.

Most of the several dozen designers interviewed for this story say the company with the worst reputation for knocking off

original products is Pottery Barn. People are allegedly so
spooked by the company that its buyers have taken to hiding
their nametags at trade shows just to get designers to talk to
them, according to Richard Stim, a California attorney who sued
Pottery Barn for a client.

In some cases the company borrows not only the design of a
product but the name as well. Jasmine Redfern designed a
"Gumball Lamp" with a unique base of beads for her company,
Whimsy Designs, based in Wesley Hills, N.Y. Redfern displayed
her lamp at a big trade show but never sold it to Pottery Barn
Kids. Yet a "Bubblegum Lamp" with a similar design appeared
in the company's winter 2002 catalog. And Salzman, the
designer in California, made an armoire with fabric on the inside
of the doors and named it the "Samantha" armoire, after a young
client who was the original benefactor of the piece. A "Samantha
Armoire," also with fabric lining the inside of the doors, started
appearing in the Pottery Barn Kids' winter 1999 catalog and is
still available.

"We often take inspiration from antiques, classic designs, forms,
and historical styles (none of which are patented or under any
copyright)," responded Brown, the PR woman for Williams-
Sonoma and Pottery Barn, in an e-mail. "These ideas are then
evolved into unique and stylish products by our own team."

But some entrepreneurs don't see it that way, and they're trying
to fight back. Judi Boisson, the quilt designer, says she'll go to
any length to stop copyright infringers. She sued Pottery Barn
Kids in 1999 for copying her "galaxy" quilt; that case was settled
out of court and Boisson is restricted from discussing the
outcome. She has also won more than $1 million from other big
retailers, including QVC, Target, and Burlington Coat Factory.

"There's no basis for this outrage," says Stacy J. Haigney, the
general attorney for the Burlington Coat Factory Warehouse. "If
by chance we do infringe, there are judicial remedies for the
copyright holder. In this case the manufacturer paid for the
damages." A QVC spokesman declined to comment.

Even more striking, X-IT, the tiny company that made the fire-
escape ladder, sued Kidde last year and won the biggest civil
jury verdict in Virginia history: $116 million (it will probably be
reduced by the judge). Kidde declined to comment.

Taking on a big company can be expensive, though. In
intellectual-property lawsuits in which less than $1 million is at
stake, attorneys' fees and costs average $400,000, according to
Penta Advisory Services in Washington, D.C., a consulting
company. When $1 million to $10 million is at stake, the fees

average $1 million. Most small businesses can't afford that, especially when the outcome is so uncertain. Aldo DiBelardino, co-founder and director of X-IT, had to remortgage his house and dip into his retirement savings to cover his legal costs for the lawsuit against Kidde. And even though his company won in court, he says some bills still remain unpaid, as X-IT hasn't yet received the check for damages.

Entrepreneurs who can't afford a prolonged legal battle often have to come up with more creative ways to retaliate. "Their lawyers can eat my lawyers," says Michael Craig, co-owner and designer at furniture company M. Craig & Co. in Columbia, S.C. His alternative plan: Humiliate them. In Craig's most brazen retaliation, he invited the trade press to watch as he dumped lacquer thinner on a knockoff of his flagship product, the Railroad Baron's bed (an opulent piece made of Honduras mahogany with hidden compartments), and then set it on fire. Another time he took out an advertisement in a trade paper and invited people to M. Craig's fictitious "semiannual knockoff sale," where he advertised that shop drawings would be given out at the door.

There are a few bright spots, however. A few organizations have stepped in to help. Karen Krieger, who had her picture frames copied by Target and was unable to foot steep attorneys' bills or risk her company's financial future, contacted the Made in the USA Foundation, a nonprofit based in Bethesda, Md., for help. In 1999 the foundation created the American Crafts Project, which has since represented more than 50 crafts designers pro bono and filed 20 lawsuits in federal court against stores and distributors (including Wal-Mart, Target, and Kohl's) that were selling foreign-made knockoffs of U.S. designs. The group has a decent track record so far: Courts have granted three injunctions to stop illegal copying, and a dozen accused companies have agreed voluntarily to stop.

Some designers remain fatalistic about the problem, however. Ingo Williams, the designer who makes picture frames in Brooklyn, steadfastly refuses to patent his products or sue. "Intellectual property is not a retirement fund," he says, adding that he wonders whether getting knocked off is the natural evolution of a good idea. His somewhat stoic strategy is to always stay ahead of the big companies and keep coming up with better products.

Others simply give up. Lisa Graves, owner of a jewelry and home accessories company in Oakland called Asil (that's "Lisa" spelled backward), says she repeatedly had her best stuff stolen. She sued Pottery Barn in 1995 to force the company to stop copying her bird-nest napkin rings (the case was ultimately

settled out of court). She came up with intricate, aluminum wire-wrapped Christmas lights that miraculously appeared in Target soon after. And at a trade show once, one of her sales reps noticed a woman wearing earrings in a distinctive heart-shaped pattern identical to the set Graves had come up with. Graves says she did some digging and found out her earrings were being sold at stores like Express, owned by the Limited, and Contempo Casuals. She did a little more digging and found out that the knockoff earrings literally had her fingerprints on them -- three manufacturers had made a mold of her original bronze version, which included an incidental thumbmark, and used it to reproduce their own copy. (Graves filed cease-and-desist letters against the retailers and manufacturers, and all cases were settled out of court.)

After 15 years in the business, Graves says, she's decided to change careers and do landscape design instead. "Things have really changed," she says. "It's more and more of a struggle to be a small designer. You can't compete."

**SUBSCRIBER**

**LOGIN** | **HOME** | **COMPANIES** | **CEOs** | **INVESTING** | **CAREERS** | **TECHNOLOGY** | **SMALL**

**Services:** Downloads | Customer Service | Conferences | Special Sections | Free Product Info | FORTU
Program
**Information:** Current Issue | Archive | Site Map | Press Center | Contact FORTUNE | Advertisi

© Copyright 2004 Time Inc. All rights reserved. Reproduction in whole or in part without permission
You may make a single printed copy of this content, solely for your personal use. For all other uses
commercial and academic uses, please visit www.FortuneReprints.com and www.FortunePermiss
Privacy Policy  Terms of Use  Disclaimer  Contact Fortune